COOPERATIVA CAFETEROS DE PUERTO RICO, Plaintiff and Appellee, *v.* GOVERNMENT OF THE CAPITAL ET AL., Defendants and Appellants.

No. 11642. Submitted July 29, 1960.—Decided February 9, 1961.

*Gilberto J. Marxuach* for appellants. *Héctor González Blanes* for appellee.

Mr. Justice Serrano Geyls delivered the opinion of the Court.

The Government of the Capital imposed on the Cooperativa de Cafeteros de Puerto Rico a municipal license tax for the fiscal year 1953–54, amounting to $397.50. The Cooperativa paid under protest, filed a complaint against the Capital and its Board of Commissioners in the Superior Court, San Juan Part, and requested a refund of the amount paid. After the corresponding proceedings, the lower court rendered judgment in favor of the plaintiff.

The Government of the Capital maintains that the trial court committed several reversible errors. It complains chiefly [1] of the court's refusal to acknowledge its legal power to impose municipal license taxes on the Cooperativa. Therefore, we shall decide whether the Government of the Capital may collect municipal license taxes from cooperative associations in general and from appellee in particular.

The power of the Government of the Capital to levy those taxes originates in the law creating said Government and in the general law of municipal license taxes. Section 18 of Act No. 99 of May 15, 1931 (Sess. Laws, p. 636, 21 L.P.R.A. § 621) ; Act No. 26 of March 28, 1914. (Sess. Laws, p. 174, 21 L.P.R.A. § § 621–639; *Cervecería India* v. *Municipality*, 77 P.R.R. 91, 96–97 (1954) ; *Shell Co.* v. *Berrocal*, ante p. 38 (1960). Section 1 of the latter

---

[1] It also maintains that the court erred in concluding that the payment of the municipal license tax made by the Cooperativa was not voluntary; in taking judicial notice of Ordinance No. 63 of the Government of the Capital; and in declaring that the Cooperativa did not derive any profits from the commercial transactions over which the municipal license tax was imposed.

Act provides that: "The municipal councils of all the municipalities of the Commonwealth of Puerto Rico are hereby authorized to levy and collect . . . on and from every *person, firm, association, partnership, corporation or other form whatsoever of commercial or industrial organization* engaged in any of the businesses or industries hereinafter mentioned, the taxes hereinafter enumerated. . . ." (Italics ours.) [2] No reason is advanced nor do we know of any why cooperatives should be excluded from the all-embracing and careful enumeration made in this section. It is therefore necessary to resort to other legal provisions to determine whether this exclusion can be justified. The trial court found this justification in the corresponding provisions of the General Cooperative Associations Act of Puerto Rico, specially in §§ 2(k), subparagraphs H and I, 3A, 4D, and 27. Act No. 291 of April 9, 1946 (Sess. Laws, p. 687; 5 L.P.R.A. §§ 881–917.)

Section 2(k) contains a definition of the word "Association" for the purposes of said Act. It enumerates the requirements which such associations should meet, among others, that they should not be for pecuniary profits (subparagraph H). Subparagraph I of said section defines the word "Supplies." [3] Section 3 enumerates the purposes for which the associations may be organized, paragraph A referring "to purchase in common supplies for itself, its members and other sponsors." Section 4 contains the powers to be enjoyed by the cooperatives and mentions in paragraph D the one "to render services in common to its members and other sponsors." Following this, it regulates the activities of the associations which extend their services to other persons not members thereof. We find nothing in the above

---

[2] The same language is used in § 3 of the Act. (21 L.P.R.A. § 623.)

[3] "*Supplies* includes, but is not limited to, foodstuffs, equipment, machinery, spare parts, and implements, as well as any other commodity which an association, a member, or other sponsor thereof, may use or require for his business, art, trade, profession, industry or other occupation, or in his farm or home."

provisions to the effect that cooperatives are "of their own nature," as stated by the trial judge, exempt from the payment of municipal license taxes. We saw already that the License Tax Act includes "any commercial or industrial organizations" and it does not require that these have pecuniary profits. On the contrary, § 4 defines the volume of business (on the basis of which the municipal license tax is computed) as "the gross receipts in any municipality of the business or industry, from its business transactions in Puerto Rico, *its gain or profits not alone to be considered*." (Italics ours.)

Section 27 of the General Cooperative Associations Act provides that said associations "being nonprofit associations, shall not be subject to the payment of income taxes." The trial court concluded that as plaintiff was "exempt from income tax, it was also exempt from municipal license taxes, which in effect were taxes on the gross receipts." In support of this conclusion it cited § § 3 and 4 of the Municipal License Tax Act, which actually provide that the municipal license tax shall be paid "on the basis of the volume of business transacted during the calendar year" and that the volume of business shall be understood to be "the gross receipts in any municipality of the business or industry."

The conclusion of the lower court is, in our opinion, erroneous. Its main premise, undoubtedly, rests on the fact that the phrase "income taxes" used in the General Cooperative Associations Act does not refer exclusively to the taxes known by that name, but to any tax which, like the municipal license taxes, may affect the income or is computed on the basis thereof. We hold, in the first place, that the phrase "income taxes" has in law, in public finance and in common parlance, a precise and definite meaning, and that there is no reason whatever to believe that the Legislature used it in the above-mentioned Act with a content other than the one given to it by the experts as well as by the ordinary citizen.

This conclusion is strengthened by the fact that the existing Income Tax Act, upon referring to exempt organizations, includes, under the section entitled "Exemptions from Tax on Corporations," paragraph 12 which provides: "subject to the requirements of Act No. 291, approved on April 9, 1946, known as 'General Cooperative Associations Act of Puerto Rico,' cooperative associations organized and operated under the provisions of such act." Act No. 91 of June 29, 1954 (Sess. Laws, p. 474, 598; 21 L.P.R.A. Cum. Supp. § 3101). In like manner, municipal license taxes are of a concrete nature and occupy an ancestral place in the theory and practice of the government of the United States and of Puerto Rico. 2 Antieau, Municipal Corporation Law 189–192 (1955); 9 McQuillin, The Law of Municipal Corporations 1–525 (1950); 3 Yokley, Municipal Corporations 260–354 (1958); *Estes* v. *City of Gadsden*, 94 So. 2d 744, 747, 750 (Ala. 1957). With these facts before us, we think it is entirely unreasonable to suppose, without further evidence, that when the Legislature granted an "income tax" exemption to the cooperatives, it was also granting them an exemption from "municipal license taxes."

In the second place, it is to be noted that our legislators have been rather sparing in the granting of tax exemptions to cooperatives.[4] These organizations did not enjoy any exemption whatever until 1926, when by virtue of Joint Resolution No. 5 of July 14 of that same year (Sess. Laws, p. 42) they were exempted from property taxes. This exemption has been in force with diverse changes since that date. 5 L.P.R.A. § 906. It was not until 1946 and by virtue of the above-cited § 27 of the Cooperatives Act, that all cooperatives were expressly[5] exempted from income taxes. Last year they were exempted from the payment of fees

---

[4] See legislative history in 5 L.P.R.A. § 881.

[5] However, since 1926 and by the administrative interpretation of § 29 of the Income Tax Act of 1924, certain kinds of cooperatives were granted tax exemption. Department of Finance, *Income Tax Regulations No. 1* (1926) 157–165. Section 29 expressly mentions the "cooperative banks"

prescribed for the registration of documents and other operations in the Registry of Property. Act No. 114 of July 12, 1960 (30 L.P.R.A. § 1770d). Consequently, there is no basis in the legislative precedents for concluding that because of the nature and functions of these associations, the exemptions which the legislator has so sparingly granted should be extended to other kinds of taxes. This has also been the case in the United States. Packel, The Law of Cooperatives, 280–317 (3d ed. 1956). Compare *Yakima Fruit Growers Ass'n* v. *Henneford*, 47 P.2d 831 (Wash. 1935) with *Peninsula Light Co.* v. *Tax Commission*, 56 P.2d 720 (Wash. 1936) and *Appeal of Beaver County Cooperative Association*, 180 Atl. 98 (Pa. 1935).

The final evidence regarding this matter is found in the legislative language and history of Act No. 81 of June 20, 1955 (Sess. Laws, p. 300; 5 L.P.R.A. § 918). It provides the following:

Section 1.—*Statement of Motives.*—The consumer cooperatives organized pursuant to the provisions of Act No. 291, approved April 9, 1946, provide an economical and socially desirable contribution to the improvement of our economic structure in the way of an adequate system of marketing and distributing produce. It is consequently clear that the fiscal policy of the Commonwealth should afford adequate incentives for the rapid organization and development of these cooperatives. The law has permitted this type of economic organization to do business, for the sake of its continued existence, with persons outside its organization. Concerning this aspect of their activities, cooperatives should be treated in the same manner as any other economic entity. However, with regard to the business they do with their members it likewise seems clear that the people who choose to improve their living conditions through this form of collective organization should be freed from tax burdens to the largest possible extent. This act is based on these principles and on the general philosophy embodied in the General Cooperative Associations Act of Puerto Rico.

---

only. Examine, besides, 5 L.P.R.A. § § 915, 916, by virtue of which the Puerto Rico Production Credit Association is exempt from the payment of income taxes.

"Section 2.—The consumer cooperative associations duly organized pursuant to the provisions of Act No. 291, approved April 9, 1946, known as the General Cooperative Associations Act of Puerto Rico, as subsequently amended, shall be exempt from payment of municipal license taxes authorized under the provisions of Act No. 26, approved March 28, 1914, known as Municipal License Tax Act, as amended, with regard to the volume of business done by the said cooperative associations with their members.

"Section 3.—The municipalities, including the Government of the Capital, shall levy and collect municipal license taxes against consumer cooperatives on the volume of business they do with other people."

As it may be seen, the above-cited provisions grant an exemption from the payment of municipal license taxes to only one kind of cooperatives—the consumer cooperatives—for special reasons which appear in the Statement of Motives, and only with regard "to the volume of business done by the said cooperative associations with their members." It is obvious that if the legislature would have believed that the exemption from income taxes also relieved all the cooperatives from the payment of municipal license taxes, it would not have had any necessity whatever to enact this law. The legislative history of this law shows that the Legislative Assembly enacted such law knowing that the exemption from the payment of municipal license taxes had not been granted to any cooperative whatsoever, including the consumer cooperatives. In the committee reports and in the debate on the bill, it was proved that the cooperatives, even the consumer cooperatives, were paying the municipal license taxes and it was clearly established that the new exemption would benefit only the consumer cooperatives, and only with regard to the business made by them with their members. Journal of Proceedings (1955) Vol. VI, Tome III, pp. 1638–1640; Tome IV, p. 2141.

By reason of the foregoing, we hold that appellee was not exempt from the payment of municipal license taxes in the

fiscal year 1953–1954, if it was engaged in any of the businesses or industries enumerated in the Municipal License Act. We must, therefore, examine the activities of the appellee on which the Government of the Capital imposed the municipal license tax.

 Appellee is engaged in a retail business located in the Hato Rey section, assigned to the Pueblo Viejo office for administrative purposes and it is one of nine branch offices of a supply department [6] created by the Cooperative for the purpose of offering to the farmers, members or not, the opportunity to buy certain products at reduced prices. Said business offered for sale (the branch office was discontinued in May 1954) chicken, poultry and cattle food, paints, seeds, and "a series of miscellaneous articles for the farmer, but especially the business was for the sale of baby chicks." Once it is established that the Cooperative, by the mere fact of being one, is not exempt from the payment of municipal license taxes, the issue to be determined is whether a business of this kind, irrespective of who owns and administers it, is exempt. The trial court concluded, without further explanation, that the above described activity "is not included in any of the businesses enumerated in § 2 of Act No. 26 of March 28, 1914" and specifically that it is not a "wholesale store" or a "mixed store."

The above-cited § 2 provides the following:

"That the businesses or industries upon which the taxes herein provided may be levied, shall be the following:

"*Group A.*—Wholesale stores, mixed stores, dry goods stores, fancy grocery stores, grocery stores, provision stores, furniture

---

[6] Appellee alleged in its complaint that "the taxes levied and collected do not lie in the case at bar, because plaintiff operates its main business in the municipality of Ponce; and as the businesses of the Cooperativa de Cafeteros de Puerto Rico, at its Ponce branch, are not distinct nor separate from that branch from whom the Government of the Capital collected the taxes, the taxes levied and collected are illegal." It was also alleged that the Board of Commissioners had included in its computation sales transacted in other municipalities. However, the evidence offered to this effect is clearly insufficient to allow us to make the analysis we made recently in *Shell Co.* v. *Berrocal, supra.*

stores, pharmacies, drug stores, hardware stores, hat stores, shoe stores, men's furnishing stores, book stores or book binding establishments, bazaars, bicycle or bicycle supply stores, notion and trinket stores, cafés, hotels, restaurants, jewelry stores, establishments for the sale of automobiles or automobile supplies or for the storage or repair of automobiles, stationery stores, confectionery stores, candy stores, ice cream parlors, establishments for the sale of optical, dental or electrical goods, establishments for the sale of lumber or woodwork, boarding houses, eating houses, milk stalls, public billiard parlors, or bowling alleys, theaters, moving picture shows and similar establishments for public amusement, watchmakers' shops, shirt-making establishments, shops repairing shoes by machinery, carpenter shops, steam or electric laundries, ice factories, tinsmith shops, bakeries, establishments for the sale of plumbing supplies, barber shops, photographing establishments, pawn shops, undertaking establishments, job printing or publishing establishments, horseshoeing establishments, boarding and livery stables, the transportation for hire of persons or freight by automobiles, carts, wagons, coaches or buggies, express businesses, peddlers, cleaning establishments, dyeing establishments and blacksmith shops.

"*Group B.*—Banks, private banking houses, electric light or power plants, railroads, electric railways, horse railways, public warehouses, race-tracks, telephone companies, lime kilns, foundries lithographing establishments, hydraulic or electric power saw mills, machine shops, tanneries, coffee cleaning mills, private docks, commercial advertising companies or agencies, hat factories operated by machinery, canning and preserving factories, and factories manufacturing any of the following products: Chocolate, trunks, matches, soda and carbonated water, souppaste, soap, candles, mattresses, bay oil, castor oil, cocoanut oil, harnesses, saddles, carts, carriages, wagons, mosaic, tile and other cement products, brick, gas, earthenware or cigar-boxes.

"*Group C.*—The businesses of sugar and molasses mills, brokers, commission merchants, agents with permanent offices and real estate agents." [6a]

In *Cervecería India* v. *Municipality, supra* at 96, we held that: ". . . The License Tax Act, we have seen, enumerates

[6a] Section 31 of the new Municipality Act grants the municipalities the authority to include herein other businesses or industries. Act No. 142 of July 21, 1960. (21 L.P.R.A. § 1173(6).)

the businesses and industries which may be licensed by a municipal corporation, and the enumeration, if on the whole such appears to be the legislative intent, is exclusive and the other industries or businesses not embraced in the enumeration are therefore excluded from the law." It is therefore necessary to examine the classifications contained in the above-cited § 2 in order to establish whether appellee's business is included therein. We forthwith rule out Groups B and C since they include businesses or industries far too different from the ones concerning us. We likewise dismiss the classification "wholesale stores" of Group A, since the evidence offered shows that appellee's business is retail sale. Nor could we find among the other classifications of that group which refer to specific businesses, one that would squarely fit appellee's business, although we do know that the goods which it expends may be bought separately in grocery stores, provisions and hardware stores.

Consequently, there remains the classification entitled "mixed stores." We have not found in the law nor in any other legislative provision, any definition whatsoever of that term. Among the decisions of this Court there is but one precedent which may offer an explanation although by way of *dictum*. The issue raised in *Municipality of San Juan* v. *Porto Rico Coal, Inc.*, 28 P.R.R. 245, 246 (1920), was whether a business selling mineral coal at wholesale is a "wholesale store" according to the License Tax Act. In order to find out the meaning of the latter, we said: "The text in English is unmistakable in pointing out, first, 'wholesale stores' (*establecimientos al por mayor*), then 'mixed stores' (*tiendas mixtas*), meaning those that partake of a character of wholesale and retail and then enumerating a number of retail stores and other establishments." [7]

We have now the opportunity to consider this problem

---

[7] In *Texas Company (P.R.) Inc.* v. *Municipality*, 81 P.R.R. 487, 490 (1959), we cited this language literally, but also as part of an explanation of the term "wholesale stores."

in a direct way and with greater care. We deem as too narrow the criterion which limits the meaning of the phrase "mixed stores" only to those in which goods are sold both at wholesale and retail. It has, in the first place, a rather artificial basis which raises the syntactic order to the rank of legislative purpose and consequently, it fixes the meaning of the law on the basis of word arrangement. The weakness of this method of construction is well known and it has been pointed out by competent authorities on different occasions. Crawford, *The Construction of Statutes* 337–338 (1940); Landis, *A note on Statutory Interpretation*, 43 Harv. Law Rev. 886, 892 (1930); 2 Sutherland, *Statutes and Statutory Construction* 393–394 (1943). Besides, even within the narrow boundaries of that mechanic method of construction, we consider it somewhat strained to say that the place occupied by the phrase "mixed stores" compels us to consider them as "wholesale and retail stores."

In the second place, the above-mentioned construction is contrary to the legal and ordinary meaning of the words, both in English and in Spanish. In both languages, the word "store" (*tienda*) means a "house, stand or shop where commercial goods are kept for sale to the public." [8] The word "mixed" (*mixta*) means "mingled with or incorporated into something" or "formed by admixture or commingling; partaking of the nature, character, or legal attributes of two or more distinct kinds or classes." [9]

Finally, a logical application of the criterion stated in the case of Porto Rico Coal, Inc. would lead to an absurd interpretation of the classification included in Group A. If the phrase "mixed stores" refers only to stores selling both

[8] 29 *Enciclopedia Jurídica Española* 853–854; Real Academia Española, *Diccionario de la Lengua Española* 1259 (1956). Our translation. See Black's Law Dictionary 1589 (1951); Webster's New Collegiate Dictionary 836 (1958).

[9] Real Academia Española, *op. cit.* at 884; 2 Alonso, *Enciclopedia del Idioma* 2856 (1958); Black's Law Dictionary 1154; Webster's New Collegiate Dictionary 539.

by wholesale and retail, then each one of the classifications that follow is exclusive, and the simple artifice of organizing a business wherein goods belonging to two or more classifications are sold, would render the Municipal License Tax Act inoperative as far as that business is concerned.[10] Thus, for example, it would be sufficient to sell footwear and hats or jewelry and drugs at the same establishment to be exempt from the payment of taxes. Department stores would, of course, be totally exempted. However, the modern commercial organization is not that simple; nor is the mind of our law-makers. Taking the words in their legal and ordinary meaning and framing them within the legislative purpose of covering the greatest possible number of businesses, which is clearly inferred from the lengthy enumeration contained in § 2 of the Municipal License Tax Act, the phrase "mixed stores" shall be understood as including the establishments which sell by wholesale and retail as well as the establishments expending goods of different kinds and which belong to the diverse classifications contained in Group A of § 2.[11] Consequently, appellee's business is a "mixed store" and the license tax imposed thereon by the Government of the Capital for the said activity is valid.[12]

---

[10] Section 7 of the Municipal License Tax Act (21 L.P.R.A. § 627) provides that: "All merchants engaging in businesses comprised in more than one group, in one establishment shall pay on the basis of the total volume of business transacted, in each group at the rate prescribed therefor." As it may be noted, this provision regulates the stores which are engaged in businesses included *in more than one* of the groups provided for by § 2, but it can not be applied to stores which are engaged in businesses included in more than one classification within a group.

[11] We believe that even omitting the phrase "mixed stores," it would be unreasonable to think that the legislator, by enumerating certain businesses in each group, intended to exempt from the license taxes those establishments combining businesses included in more than one classification within the same group.

[12] In its brief the Government of the Capital granted that "the commercial activities in which the plaintiff is engaged in its supply department or warehouse are not included in the License Tax Act of 1914." Scarcely two months ago we faced an identical situation. In *Coll* v. *Picó*, 82 P.R.R. 26 (1960), after a careful analysis we held that: "No stipulation or admission made by the parties may deprive the court of

■ In view of this finding, it is unnecessary to decide the other issues raised in this appeal. However, we must add that the allegation of unconstitutionality made by the appellee against the Municipal License Tax Act, on the ground that the said law imposes a progressive tax upon gross income and that consequently it violates the guarantees of uniformity, equal protection and due process of law, is untenable. The validity of this kind of taxes is an established fact in our constitutional law. *People* v. *Subirá*, 27 P.R.R. 567, 569 (1919); 2 Antieau, *op. cit. supra* at 190; 9 McQuillin, *op. cit.* at 77–80; *Langston* v. *City of Danville*, 54 S.E. 2d 101 (Va. 1949); *Davis* v. *Ogden City*, 215 P.2d 616, 624 (Utah 1950); *Brodhead* v. *Borthwick*, 174 F.2d 21 (9th Cir. 1949), *cert. denied*, 338 U.S. 847 (1949); *Pacific Telephone & Telegraph Co.* v. *City of Seattle*, 21 P.2d 721, 723 (Wash. 1933), 291 U.S. 300 (1934); *cf. Greenleaf & Crosby Co.* v. *Coleman*, 158 So. 421 (Fla. 1934); *Ex parte Mehlman*, 75 S.W.2d 689 (Tex. 1934).

The judgment appealed from is reversed and a new judgment shall be rendered dismissing the complaint.

Mr. Justice Hernández Matos and Mr. Justice Blanco Lugo did not participate herein.

its power to interpret the law" and that "the function of finding the law belongs exclusively to the judge and by virtue of this power, the court is at liberty to apply the rule it deems pertinent and adequate, even though it must depart from the allegations, admissions or stipulations of the parties."